McDONALD, Appellant, v. STEWART, et al., Respondents.

No. 9267.

Submitted May 28, 1953. Decided July 16, 1953.

259 Pac. (2d) 799.

Mr. Louis P. Donovan, Shelby, for appellant.

Messrs. Hall, Alexander & Burton, Great Falls, for respondents.

Mr. Donovan and Mr. Hall argued orally.

MR. JUSTICE FREEBOURN:

This is an action in equity wherein S. A. McDonald, plaintiff and appellant, sought specific performance of an agreement

alleged to have been made with Boyd Stewart, defendant and respondent, whereby McDonald would be decreed the owner of an undivided one-half interest in an oil and gas lease as against Stewart, R. L. Pattie and Pardee. At the conclusion of plaintiff's case the action as to Pardee was dismissed. At the conclusion of the entire case the trial judge made findings of fact and conclusions of law in favor of Stewart and Pattie, and rendered a decree and judgment dismissing plaintiff's complaint. From the decree and judgment in favor of Stewart and Pattie, McDonald appeals.

The complaint alleges McDonald, Stewart and Pattie were copartners in certain oil and gas operations in Glacier County, Montana, under an oil and gas lease known as the Swenson lease; that on May 21, 1951, McDonald and Stewart made an agreement, in writing, whereby Stewart offered McDonald a first refusal to participate fifty-fifty with Stewart and Pattie in any oil and gas lease Stewart and Pattie should acquire in the vicinity of the Swenson lease, on payment by McDonald to Stewart and Pattie of fifty per cent of the cost of obtaining such lease; that McDonald agreed to grant to Stewart and Pattie a first refusal to acquire on a fifty-fifty basis with McDonald an interest in any oil or gas lease which McDonald should acquire in the State of Montana, on payment by Stewart and Pattie of fifty per cent of the cost of acquiring such lease; that on June 12, 1951, the State of Montana offered for oil and gas leasing state land known as tract No. 7, which was in the vicinity of the Swenson lease; that it was orally agreed between McDonald and Stewart that Stewart would attend such state leasing and bid on said tract No. 7, on behalf of himself and McDonald, and if Stewart was the successful bidder for such tract No. 7, at a price not exceeding $25,000, McDonald would advance such money and Stewart would have the right and option to take a one-half interest in such lease on tract No. 7, upon payment to McDonald, within a reasonable time thereafter, of one-half of the cost of acquiring said tract No. 7 lease; that Stewart was the successful bidder upon the tract No. 7 lease, but that he took such lease in

the names of Stewart and Pattie only; that McDonald was ready to and offered to carry out the terms of his agreement, but that the agreement was repudiated by Stewart and Pattie, and they refuse to transfer to McDonald any interest in the tract No. 7 lease, which covered 559.42 acres. McDonald asked that he be decreed a one-half interest in the tract No. 7 state oil and gas lease and that Stewart and Pattie be required to make an assignment to McDonald of such interest.

Separate answers of defendants to the complaint and replies thereto by plaintiff made up the issues.

McDonald testified that: It was agreed between himself, Stewart and Pattie that ''we should jointly apply—put in an application * * * to the state board * * * that Mr. Stewart should apply in his name * * * I thought it best to put in writing * * * an arrangement where I would be willing to offer him a partnership basis on acreage which I could acquire and wanted the same right of acreage that he would acquire * * *''

The arrangement in writing was a letter written to Stewart by J. A. McDonald, under date of May 21, 1951, in part as follows: ''I am writing you at the request of Mr. McDonald [plaintiff] to confirm an agreement which you made last week with respect to further acreage acquired in the State of Montana with reference to natural gas and petroleum lease. As I understand it you are prepared to offer Mr. McDonald a first refusal to participate 50-50 with yourself and Mr. Pattie in any lease which you acquire on the payment by Mr. McDonald of 50% of the cost of obtaining the said lease. As I further understand it Mr. McDonald is prepared in consideration of the above to grant you a first refusal to acquire on a 50-50 basis with himself an interest in any lease of petroleum or natural gas he may acquire in the State of Montana on the payment by yourself of 50% of the cost of acquiring the aforementioned lease * * *'' Stewart's written approval of the contents of the letter appears on such letter.

On June 12, 1951, McDonald was in Toronto and conversed with Stewart, then in Helena, by telephone. McDonald testified:

"* * * I told him I could provide twenty-five thousand dollars but that I couldn't do it instantly, but within the next 48 hours I could cover any check he wrote up to that amount. With that he asked if I could cover it and I said yes, that I would forward the funds to his payment at Cut Bank within 48 hours. * * * I would cover the funds before sometime Thursday * * * I would supply the money and at some later date when Mr. Stewart could afford to pay his half he would then pay the half—I said I would put up the twenty-five thousand. I said, 'I will put that up and if we are successful you pay me your half back later and we can adjust that later.' * * * I talked to Mr. Stewart the next Friday. * * * it [the price bid for the lease] was approximately $22,500 and I was told that Mr. Pardee was getting 160 acres and which would reduce the total down to something in the vicinity of * * * between sixteen and eighteen thousand dollars. * * * I went down and made arrangements on Thursday to transmit the funds for the account of Mr. Boyd Stewart in the Glacier Bank at Cut Bank through the First National Bank at Buffalo, and I was in the bank myself personally when those funds * * * eighteen thousand dollars * * * were transmitted before that bank in Buffalo closed on that Thursday * * * the 14th * * *."

The evidence shows the $18,000 was sent to the Union Bank and Trust Company at Helena, to the credit of Charles Angsburger. Although the Glacier Bank of Cut Bank did not receive the money they did receive, on June 15th, from the First National Bank of Buffalo, a telegram stating "conditions unacceptable for release of money to Boyd Stewart please return $18,000 advance to First National Bank of Buffalo through same channels as received * * *."

The Glacier Bank never received any money from McDonald to be credited to Stewart or Pattie.

Charles Angsburger, vice-president of the First National Bank of Buffalo, testified: "McDonald said he wanted to forward the eighteen thousand dollars to the Bank of Glacier County in Cut Bank but that he had some misgivings about the terms under which the money would be used, and as I understand wanted to

192

make a telephone call to a Mr. Stewart * * *'' Angsburger transmitted the money to the Union Bank and Trust Company of Helena to his own credit, ''based on Mr. McDonald's instructions,'' and on June 17th the money was returned to his bank in Buffalo.

McDonald testified that on Friday, June 15th, he talked by telephone to Stewart who said ''that he had not received the money on Thursday so he had made another deal.'' The following week he talked to Stewart who said ''that they had made other arrangements for the money * * * Boyd said at that time that he refused to accept the money.''

On cross-examination McDonald testified he was to advance the entire amount of money necessary to secure the lease on tract No. 7, ''because Boyd Stewart said he had no money in the bank then. * * * I told Boyd Stewart over the phone that I would transmit the funds to his bank [Bank of Glacier County in Cut Bank] on Thursday,'' June 14th, on the day of and after the lease auction. McDonald, through a telephone conversation, learned that the total amount bid on the lease by Stewart ''was twenty-two thousand, five hundred'' dollars. He was told ''that Mr. Stewart was very anxious that I have the money in his hands —in his account to cover his check before the check got to the bank and I told Mr. Edgar to tell him that I would transmit the funds as I told him I would do.'' On Friday, June 15th, McDonald talked to Stewart by telephone and at that time, ''I asked Mr. Stewart if he had been advised by the bank that the funds were there and he told me the funds hadn't been received —had not arrived * * * he mentioned something about a wire and a man by the name of Angsburger named in it and that they couldn't understand it, and I said the reason for that was I wished to speak to him personally over the phone before we released the funds to you to ask you if you would leave a little note at the bank whereby you agreed to assign me 50% of the lease to protect me in case anything should happen. * * * I told him there was a credit there in the bank for him which would be released to him upon my instructions to Angsburger after he

agreed to leave a note there that I would get an assignment of 50% of the lease—that he would assign me 50% of the lease.

"Q. For how much money? A. For nothing.

"Q. He would assign you 50% of the lease for nothing? A. He owed me nine thousand dollars and he said, 'We are going to work that out.'

"Q. The lease was in the name of Messrs. Pattie and Stewart, wasn't it? A. Yes."

Norman Edgar, a land man for the Imperial Oil Company in Calgary, Canada, and Arthur Bessemer, a barrister from Calgary, were with Stewart when he made the successful bid on tract No. 7. The evidence would indicate they were representing McDonald. On cross-examination Edgar testified:

"Q. You knew, of course, that the funds had to be available immediately after the successful bidding had taken place? A. I surmised that would be the case. * * *

"Q. When you had your conversation with Mr. McDonald on the 11th you expected funds to be made available prior to the time of the auction, did you not? A. Yes, I did.

"Q. And you didn't discover until about thirty minutes before two o'clock on June 12th that the money would not be available; is that correct? A. Yes.

"Q. And you didn't have any money to make any bid? A. No. * * *

"Q. Did Mr. Stewart advise you that he didn't have the money? A. Yes, he did. * * * A. Mr. Stewart said if it [the money] wasn't here by Thursday he was going to have to make other arrangements, that he could acquire the funds necessary somewhere else—at least he felt he could—and would make other arrangements to cover the check he had drawn on the bank. * * *

"Q. The only deadline that Mr. Stewart placed upon the availability of the funds was that they should be out here immediately? A. Yes; that was the general understanding until immediately prior to our departure from Great Falls on the plane at which time Mr. Stewart said that he would like me to inform McDonald unless the funds were here by

Thursday he was going to have to make other arrangements.''

Pardee, one of the defendants, an oil producer and driller from Encino, California, testified that he had tract No. 7 put up for bidding. He testified:

''Q. Did you have anything to do with the putting of that land up for sale? A. Yes, sir; I put it up.

''Q. When you say you put it up what do you mean? A. I made the application for that lease. * * * thirty days prior to June 12th; the date of the sale. * * *

''Q. And Messrs. Stewart and Bessemer and Edgar advised you as to their purpose in being in Helena? A. They were as competitors. * * *

''Q. Now, did you do any bidding on Tract 7 at the sale? A. Yes, sir.

''Q. And did Mr. Stewart do any bidding on Tract 7? A. Yes, sir.

''Q. Who was the successful bidder? A. Mr. Stewart was the successful bidder. * * * There was a rather lengthy discussion between Mr. Edgar and Mr. Stewart regarding finances.

''Q. What was that discussion? A. Nothing other than Mr. Stewart told them the money would have to be up within 48 hours and gave him to Thursday afternoon to get the money up.''

On cross-examination he said his high bid on tract 7 was $30 an acre; Union Oil Company of California bid $38 and Stewart bid $40. Pardee was willing to go to $40, but made a deal with Stewart, that if Stewart was the successful bidder, Pardee would take 160 acres of tract 7 and pay $40 an acre for it. ''We [Pardee and Stewart] agreed to participate in the purchase of the Tract 7, yes sir, jointly.

''Q. And agreed that you would go up as high as forty dollars an acre? A. Yes, sir.''

Pattie, defendant, testified that in order to secure the lease on tract No. 7: ''We borrowed the money.

''Q. Where? A. The Bank of Glacier County. * * * We gave a note. Personal note.

''Q. Personal note of yourself and Stewart? A. That is

right; Pattie and Stewart.'' The note was for $16,001.30, bearing interest at the rate of six per cent per annum.

Boyd Stewart testified: ''Our agreement with Mr. McDonald was that Mr. McDonald would pay—put up the money for those leases to bid them in, and if Pattie and Stewart wished to come in for their one-half—any interest up to and including 50%—they could automatically declare themselves in and pay their part of the money, as we got it.

''Q. When was Mr. McDonald to pay for the leases? A. He was to have the money before the lease sale.

''Q. Can you now recall how much money he was to have available? A. Mr. McDonald said he would have one thousand dollars an acre there for that Section 7.

''Q. Now, what value did you place upon Tract No. 7, yourself, Mr. Stewart? A. I placed my value a lot higher than my partner placed his. I thought it was possibly worth five hundred dollars an acre. * * *

''Q. Didn't you say anything to Mr. Bessemer or Mr. Edgar about the fact that you didn't have any money to bid with? A. I did ask them if Mr. McDonald had his money in Montana yet and they told me he had not but that they were assured themselves that he would have the money in Montana before the land sale—lease sale. * * * Mr. McDonald did tell me that he would have some money there before two o'clock, before time for the auction.

''Q. He would have money before two o'clock? A. In Montana.

''Q. Available for bidding upon this land? A. That is right. * * *

''Q. What was the conversation between you and Mr. McDonald at that time? A. He failed to get his money. He said he failed to get his money. He said he couldn't get his money there and he asked me personally to bid on the leases. * * * he assured me that he would have twenty-five thousand dollars put in the Bank of Glacier County to my credit before the bank closed on the afternoon of the 14th. * * * that he would have that money

absolutely before the bank closed the afternoon of the 14th, the Bank of Glacier County, to my credit without any strings attached to it. * * *

"Q. Had you any conversation with Mr. McDonald or Edgar or Bessemer in which you said that the money had to be available to you not later than Thursday following the land sale? A. Absolutely. I told Mr. McDonald from the Placer Hotel just prior to the lease sale that I would have to have the money before the bank closed Thursday and he promised absolutely to have the money before it did close on Thursday. * * * I might have talked to McDonald * * * the next week. * * * He wondered how he could come in on that state lease, Section 7 with us. * * * I told him that my partner and I considered that he let us down and that the only way he could come in would be like any other lease buyer or horse trader. * * * possibly the 25th of June * * * I told him * * * we didn't want to go into any further deals with Mr. McDonald—we didn't want to sell him part of that lease. * * *

"Q. Did he make any tender of any money to you? A. Never has.

"Q. Has he ever made any money available to you? A. Not in the United States.

"Q. I mean with reference to this Tract 7, this lease on this Tract 7? A. Not one dollar."

On cross-examination Stewart testified:

"Q. And also your understanding and agreement with Mr. McDonald at that time was that Mr. McDonald would have a half interest in the lease? A. If he put up the money.

"Q. If he what? A. If he put up the money. * * *

"Q. Just what was said by you that there be no strings attached to the transmission of the money? * * * A. I asked Mr. McDonald if he positively knew that he would have the money there for me and he said he would. I told Mr. McDonald, 'You have let me down several times before on almost everything that we have had to do with one another and a fellow could get in serious trouble if he bid on land in that land sale and gave a check for it and didn't have money to cover it.' Mr. McDonald

told me, 'Don't worry about that. I absolutely promise and give you my word that I will have the money in the Bank of Glacier County before the bank closes Thursday.' * * * Mr. McDonald said that he would have the twenty-five thousand dollars put to my credit in the Bank of Glacier County before the bank closed Thursday, and I said, 'Without any strings attached, Sid,' and he said, 'Without any strings attached.' That was because I have never had one deal with McDonald to date that we saw the thing through. He promised me something and then he would go contingent from one to three different things. I told him there must be no contingency, no strings attached, and he said, 'absolutely not.' * * *

"Q. What did you mean by 'no strings attached'? A. I meant that I would be satisfied by Mr. McDonald that he would have the money there so that I could pay for the lease if I bought it."

On redirect examination Stewart testified:

"Q. Was there any money placed in the Bank of Glacier County to your knowledge to your credit by Mr. S. A. McDonald during the month of June, 1951? A. Not any.

"Q. Not during the entire month? A. That is right.

"Q. Has any money ever been placed in the Bank of Glacier County to your credit by Mr. S. A. McDonald? A. Not any."

In rebuttal McDonald testified: "The court: Answer yes or no. Did you agree to remit twenty-five thousand dollars to his credit? A. Yes."

Bessemer, called in rebuttal, testified concerning the telephone conversation between McDonald and Stewart that the words "no strings attached" were used in such conversation by Stewart.

The evidence justifies the trial court's finding of fact No. 1 that plaintiff and defendants operated the Swenson lease as partners under a specific written agreement, until plaintiff disposed of his interest to the Albermont Petroleum Company.

Also justified by the evidence is finding of fact No. 3 to the effect that Stewart, acting for himself and Pattie, paid $22,-378.30 for the lease on tract No. 7; and that no part of such

price was paid by McDonald. The trial court correctly found from the evidence, as set out in finding of fact No. 5, that Stewart and Pattie were the owners of the oil and gas lease covering tract No. 7.

Findings of fact Nos. 6 and 7 were correctly made under the evidence before the court; finding No. 6 holding McDonald had no interest in the lease covering tract No. 7, while finding No. 7 held that McDonald had failed to prove any claim or right to such lease as alleged in his complaint.

Under the evidence the court correctly concluded that Stewart and Pattie were entitled to a decree and judgment in their favor and properly rendered the same.

McDonald's own testimony shows that he did not perform his part of the agreement upon which he relies and which he asks the court to compel Stewart to perform.

McDonald testified: He was to advance the entire amount of money; "approximately $22,500," necessary to secure the lease on tract No. 7, "because Boyd Stewart said he had no money * * * I told Boyd Stewart * * * that I would transmit the funds to his bank [Bank of Glacier County] on Thursday," June 14th. He said he promised "to forward the funds to his [Stewart's] payment at Cut Bank within 48 hours * * * before * * * Thursday." This money was, according to Stewart, to have "no strings attached."

McDonald did not send the money agreed upon. He sent no money to the bank at Cut Bank, or any place else, to Stewart's credit or payment. He had $18,000 sent, not to the bank at Cut Bank, but the bank at Helena, not to Stewart's credit or payment, but to the credit of Angsburger, vice-president of the Buffalo bank, and the money had "strings attached to it." Angsburger testified: "McDonald said he wanted to forward the eighteen thousand dollars to the Bank of Glacier County in Cut Bank, but that he had some misgivings about the terms under which the money would be used. * * *" McDonald testified that when Stewart said he could not understand the money being in Angsburger's name, McDonald said: "The reason for that

was * * * before we released the funds to you to ask you if you would leave a little note at the bank whereby you agreed to assign me 50% of the lease to protect me in case anything should happen. * * * [the money] would be released to him upon my instructions to Angsburger after he [Stewart] agreed to leave a note there that I would get an assignment of 50% of the lease —that he would assign me 50% of the lease.

"Q. For how much money? A. For nothing."

One can reasonably conclude from the evidence that not only did McDonald fail to perform his part of the agreement but that he was insisting that Stewart do something that the agreement did not contemplate. It would also seem that McDonald had no confidence in Stewart and, therefore, would not trust the money in his hands, or, believing Stewart had no money, was forcing Stewart to assign him 50% of the lease, as he said, "for nothing."

Had Stewart been compelled to rely on McDonald as the only source for the price bid for the lease, Stewart would have had no lease and, having written a check which he could not make good, might have found himself in jail. The shoe "of lack of confidence" was not only on the one foot. It was on both, for a reading of Stewart's testimony shows he had no confidence in and did not trust McDonald. He said he was willing to deal with McDonald as any other "horse trader," which brings to mind the horse traders of years gone by who pushed corn cobs into the nostrils of some horses or fed them gunpowder to cover up the heaves.

Before McDonald is entitled to specific performance by Stewart, he must show that he has performed his part of the agreement. This he has failed to do. R. C. M. 1947, sec. 17-803, provides: "Neither party to any obligation can be compelled specifically to perform it, unless the other party thereto has performed * * *."

Unless performance is waived or excused, a plaintiff seeking to enforce a contract must perform his obligations thereunder, and plaintiff's wilful violation of an essential covenant

of a contract is a defense to specific enforcement of the contract. 81 C. J. S., Specific Performance, sec. 94, p. 614.

For the reasons stated the judgment of the district court is affirmed.

MR. CHIEF JUSTICE ADAIR, and ASSOCIATE JUSTICES BOTTOMLY, ANGSTMAN and ANDERSON, concur.